*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v

GRANT CHARLES BALOGH,

       Defendant-Appellee.

UNPUBLISHED
April 16, 2020

No. 343097
Wayne Circuit Court
LC No. 17-009293-01-AR

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v

GABRIEL VICTOR BALOGH,

       Defendant-Appellee.

No. 343098
Wayne Circuit Court
LC No. 17-009329-01-AR

Before: TUKEL, P.J., and JANSEN and RIORDAN, JJ.

JANSEN, J. (*dissenting*).

I respectfully dissent.

Recently, our Supreme Court reiterated that,

> In order to bind a defendant over for trial in the circuit court, the district court must find probable cause that this defendant committed a felony. This standard requires evidence of each element of the crime charged or evidence from which the elements may be inferred. Absent an abuse of discretion, a reviewing court should not disturb the district court's bindover decision. An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes. [*People v Anderson*, 501 Mich 175, 181-182; 912 NW2d 503 (2018), quoting *People v*

-1-

*Seewald*, 499 Mich 111, 116; 879 NW2d 237 (2016) (quotation marks and citations removed).]

In Michigan, it is the role of a magistrate during a preliminary examination to determine whether probable cause exists to conclude that a defendant has committed a crime, and therefore will be bound over for trial. *Anderson*, 501 Mich at 183. "Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Id*. at 184, quoting *People v Yost*, 468 Mich 122, 126; 659 NW2d 604 (2003). MCL 766.13 "requires a magistrate to consider *all* the evidence presented," and to draw his or her conclusion at the end of the preliminary examination. *Anderson*, 501 Mich at 184 (alteration in original).

The magistrate in this case presided over a lengthy preliminary examination, replete with testimony from several witnesses including the Assistant Wayne County Medical Examiner, Dr. Lokman Sung, who was qualified as an expert forensic medical examiner, Dr. Ljubisa Dragovic, Chief Resident Pathologist and Chief Medical Examiner for Oakland County, who was qualified as an expert in forensic pathology and neuropathology, and the Director of the Ataxia Clinic at the University of Michigan, Dr. Vikram Shakkottai, who was qualified as an expert in the field of neurology and Spinocerebellar Ataxia.

Dr. Sung performed the autopsy on the decedent, Vickie Balogh. At the time of the autopsy, Dr. Sung was aware that Vickie suffered from Spinocerebellar Ataxia Type 1, and was clear at the preliminary examination that he possessed no special training or expertise in the condition. Indeed, Vickie was the first person he had performed an autopsy on with Spinocerebellar Ataxia Type 1. Dr. Sung testified that despite his unfamiliarity with the disease, he had read five or so journals on the topic after performing the autopsy, but before authoring his report. Yet at the preliminary examination, Dr. Sung could not recall even one title of a journal he read, and obviously they were not produced. Dr. Sung also testified that despite having access to an investigator, he only used that investigator to obtain medical records, and further, Dr. Sung failed to speak with anyone who had some expertise in the area of Spinocerebellar Ataxia Type 1.[1] Ultimately, Dr. Sung opined that Vickie's cause of death was cachexia, or "the wasting of the body to a point that it would not further sustain life," and the manner of death was indeterminable. Dr. Sung wrote in his summary and opinion contained within Vickie's autopsy report,

> It is my opinion that death was caused by cachexia due to malnutrition. According to available medical records, the decedent had a past medical history significant for spinocerebellar ataxia. Sporadic medical records extending back to 2009 indicate a relatively stable body weight of approximately 100 lbs, with the last documented weight of 100 lbs and a BMI of 17.7 on September 22, 2015. At the time of autopsy, the body weight was 79 pounds with a BMI of 13.6. The most recent physician record also states that the natural disease was likely to progress and that discussions

---

[1] Dr. Sung did not bring Vickie's medical records with him to testify at the preliminary examination. In fact, the medical records that Dr. Sung testified that he reviewed were destroyed in keeping with the Wayne County Medical Examiner's procedures.

regarding resources to help with patient needs and advanced directives were needed. It is unknown to this author the outcome of those discussions. There is no documentation on mental disability, but it is unclear from the records the ability of the decedent to eat and perform activities of daily living.

The manner of death is indeterminate. If additional information becomes available, review and modification of the manner of death may be appropriate.

Dr. Dragovic, who testified at the request of defendants' attorneys, reviewed Vickie's medical records as well as the Wayne County Medical Examiner's Report authored by Dr. Sung. Dr. Dragovic also reviewed autopsy photographs and microscopic slides that had been "generated as relevant diagnostic evidence in [this] case." Dr. Dragovic is familiar with Spinocerebellar Ataxia Type 1, and explained that Vickie suffered from the disease. Dr. Dragovic explained that Spinocerebellar Ataxia Type 1 is a rare, hereditary condition in which individuals "suffer a gradual, progressive . . . wasting of their muscles, their body in general, because of the inability to move and control the movements adequately, which is all caused by the degenerative process that is pre-coded in the genetic material that is passed from one generation to the other[.]"[2]

Indeed, Dr. Dragovic was clear that wasting is a clinical sign of Spinocerebellar Ataxia Type 1, and is caused by "altered metabolic rates in these individuals[.]" The physical wasting, as well as "various other complications . . . leads to early death, and it is well known that the sooner the condition gives a clinical appearance, the sooner the lifespan [sic]." Dr. Dragovic was also clear that "weight loss is an inevitable aspect of this condition–this disease–and it's also tied into the process of malfunctioning of the brain stem control, the control of the cranial nerves . . . that are situated in the brain stem, and the difficulties in swallowing that get more and more enhanced as the disease progresses."

Dr. Dragovic further testified that "people with this condition end up dying from respiratory complication." Indeed, Dr. Dragovic was of the opinion that Vickie did succumb to pneumonia, explaining that:

Dr. Sung submitted samples in three microscopic slides. Two of those microscopic slides – in those three microscopic slides that contained samples of the lungs, bronco pneumonia cannot be missed by anyone other than a totally blind individual.

Moreover, Vickie's liver showed "severe enteropathy," and her kidneys showed significant scarring; both characteristics of the disease. According, Dr. Dragovic offered the following opinion on cause of death:

---

[2] Indeed, Vickie inherited the disease from her mother Carolyn Masserant, who also died from Spinocerebellar Ataxia Type 1. All three of Vickie's brothers also died from the disease, and it is believed that one of defendants also inherited Spinocerebellar Ataxia Type 1. Vickie's father and step-mother both testified at the preliminary examination that Vickie did not wish to undergo extreme lifesaving measures like her siblings, and that her wishes were to live at home with her sons.

The immediate cause of death was focal and bronco pneumonia complicating familial Spinocerebellar Ataxia Type 1. Was there cachexia? Yes. Cachexia means wasting, and yes, there was wasting, because this unfortunate condition offers the causeway for the progressive wasting of the muscles and other soft tissue.

Dr. Dragovic further opinioned that Vickie's manner death was a "natural death based on everything I know about the familial condition."

The magistrate also heard testimony from Dr. Shakkottai about Vickie's time as a patient at the University of Michigan's Ataxia Clinic, and about the disease in general. Dr. Shakkottai touched on the fact that Spinocerebellar Ataxia Type 1 is "a hyper-catabolic state meaning that normal metabolism is increased, and therefore there is a propensity for weight loss . . . This is in addition to problems with swallowing that can make maintaining adequate body weight difficult[.]" The rapid and extreme weight loss experienced by Vickie was characteristic of her disease. It was unpredictable, and something Dr. Shakkottai had seen in patients before.

Dr. Shakkottai also explained that patients with Spinocerebellar Ataxia Type 1 "are at a high risk for aspiration pneumonias which commonly manifest as bronco pneumonia." Treatment options include undergoing a "tracheostomy, and be[ing put] on a ventilator, which is not an option that most patients care for."

Importantly, Dr. Shakkottai testified that Spinocerebellar Ataxia Type 1 does not affect an individual's cognitive abilities, and as the disease progresses, "[t]he majority of patients . . . prefer to stay at home in a familiar environment that brings them solace in spite of having a very debilitating condition." There was nothing unusual about Vickie potentially seeking to live the remainder of her life at home, as peacefully as she could, with little medical intervention.[3] This would be particularly true where the natural progression of Spinocerebellar Ataxia Type 1 "is to worse speech and coordination . . . swallowing, coordination of the limbs can be affected to an extent that people are incapable of self-care[.]" Dr. Shakkottai opined that "[o]ther than a feeding tube or some other invasive measure," there was nothing that could have been done to prolong Vickie's life, and that her death was "consistent with the natural progression of the disease."

Following the close of proofs, the trial court articulated on the record its conclusion regarding the prosecution's motion to bindover defendants. The magistrate correctly reiterated the prosecutor's burden of proof (probable cause, *Anderson*, 501 Mich at 183) and the elements of each crime charged: second-degree vulnerable adult abuse, MCL 750.145n(2), involuntary manslaughter, MCL 750.321, and felony murder, MCL 750.316(1)(b). The magistrate went on to

---

[3] Adult Protective Services Investigator Jacqueline Thurmand visited defendants the Vickie at home before Vickie's death in order to investigate whether Vickie was being neglected. However, Thurmand testified at the preliminary examination that Vickie made no statements that would cause her concern. Vickie was eating, not being neglected, and indicated that she wished to stay with her sons in the home. She liked staying on the mattress on the floor because the television was there, and she liked to watch it. Indeed, Thurmand was of the opinion that defendants were attentive to their mother. Ultimately the neglect complaint was determined to be unsubstantiated.

conclude that defendants admitted they were Vickie's caregivers, that Vickie was a vulnerable adult, that defendants assumed the legal duty to care for Vickie, and that defendants had the capacity to carry out that duty. Thus, the magistrate noted, this

> case then hinges on whether the [prosecution] have shown by probable cause that defendants either intended to kill their mother, or intended to do her great bodily harm, or knowingly created a very high risk of their mother's death, or great bodily harm to their mother, knowing that her death or such harm would be the likely result of their actions; or that defendants committed a reckless act or reckless failure to act that caused their mother's death; or that defendants willfully neglected or refused to perform their duties and that failure to act caused their mother's death. Did defendants intend to kill their mother, or cause her great bodily harm, or knowingly create a very high risk of her death, or great bodily harm knowing that such would result[?]

The magistrate concluded that the prosecution had not made the requisite showing, concluding:

> The evidence provided in this case does not arise to the requisite level of intent. . . It does not show, even by probable cause, that defendants knowingly created a very high risk of death of their mother or great bodily harm knowing that death or such harm would be the result of their actions.

> \* \* \*

> The record shows that the defendants cared for their mother, carried her to and from the bathroom to use the toilet, changed her adult diapers, brought home food from their place of employment for their mother to eat, placed their mother in front of the television in the living room where she enjoyed watching TV, and even changed their work schedule so their mother would not be left alone in the home where she wanted to stay. The People failed to show the requisite intent for these charges.

> \* \* \*

> [Additionally, t]here is no evidence that [defendants] caused the death of their mother[.] No question remains, then, as to whether there is probable cause to bind over defendants on the charged crimes[.] . . . I find there is no factual issue for a trier of fact to decide as to whether [defendants] caused the death of their mother by either failing to provide her with medical treatment and/or nutrition.

> There is no evidence, let alone enough to arise to even a low threshold, to establish probable cause that Vickie Balogh died from any reckless action or inaction of either [defendant]. Therefore, the People's Motion to Bindover is denied and these charges against [defendants] are hereby dismissed.

The Wayne County Circuit Court reviewed the magistrate's decision not to bindover defendants, and to dismiss all charges against them, and found no abuse of discretion. I agree.

-5-

The overwhelming evidence presented at the preliminary examination was clear: following a difficult and debilitating battle, Vickie Balogh succumbed to complications from Spinocerebellar Ataxia Type 1, a genetic, degenerative disease. Defendants, Vickie's sons, selflessly stepped up to provide end of life care for their mother. True, their house was dirty, there could have been more food in the house, and perhaps in a panic, they made a poor choice to transport Vickie to the emergency room following her death. But the record in this case is void of any indicia that defendants either intended to harm or kill their mother, or that they actually caused her death.

I find the majority's review of this case to be cursory, and I struggle to understand how, after a thorough review of the record before this Court, anyone could conclude that the magistrate's decision was an abuse of discretion. Defendants have had to watch their mother suffer and die from this horrible disease, and now the majority seeks to have them stand trial for her murder.

The prosecution in this case did not meet their burden to establish the elements of the crimes charged by mere probable cause. The record shows that Vickie watched her mother and three of her brothers suffer from and ultimately succumb to the same disease. Vickie was clear with her family: she did not want to endure the same suffering that accompanied extreme end of life measures. She wanted to be at home, with her sons, where she was as comfortable as possible and could die with dignity. Her sons honored their mother's wishes.

Vickie died of natural causes. The record is abundantly clear that Dr. Sung lacked any familiarity with Spinocerebellar Ataxia Type 1, and concluded that Vickie's manner of death was indeterminable. However, Dr. Dragovic, who is familiar with the disease, could easily determine that Vickie died of complications relating to Spinocerebellar Ataxia Type 1, specifically bronco pneumonia. Dr. Dragovic further explained that the extreme wasting Vickie endured was a clinical symptom of the disease, and was to be expected at the end stages.

Dr. Shakkottai's testimony was consistent with Dr. Dragovic's testimony: weight loss in end-stage Spinocerebellar Ataxia Type 1 is unpredictable, but also expected, as is bronco pneumonias as a result of a high risk of aspiration when patients lose the ability to swallow. Dr. Shakkottai also explained that Spinocerebellar Ataxia Type 1 does not affect a patient's cognitive abilities. Vickie would have been able to make informed and intelligent decisions about her care, and indeed, many patients choose to die with dignity in their own homes and to avoid extreme life-prolonging measures.

Finally, the majority concludes that the trial court erred by failing to adequately consider statements defendants made at the hospital and to law enforcement after Vickie's death relating to defendant's care of Vickie before her death. However, in my view, the majority fails to appreciate that at the preliminary examination stage of a criminal proceeding, a magistrate has a "duty to pass judgment not only on the weight and competency of the evidence, but also [on] the credibility of the witnesses." *Anderson*, 501 Mich at 187, quoting *People v Paille*, 383 Mich 621, 627; 178 NW2d 465 (1970). Although the lesser standard of probable cause allows for a magistrate to "legitimately find probable cause while personally entertaining some reservations regarding guilt[,]" all evidence presented by the prosecution must allow "a person of ordinary prudence and caution" to entertain "a reasonable belief of the accused's guilt." *Anderson*, 501 Mich at 188. The magistrate acted within her discretion by giving less weight to defendants' statements in light of all other evidence presented.

Moreover, without defendants' statements, which in my view are not as inculpatory as the majority would like to believe, the prosecution failed to present evidence from which a "person of ordinary prudence and caution" could entertain "a reasonable belief" that the required elements of intent and causation had been established by probable cause. Therefore, because the prosecution failed to meet is burden of proof with respect to the corpus delicti in this case, any inculpatory statements made by defendants could not be considered as evidence of consciousness of guilt. See *People v McMahan*, 451 Mich 543, 548-549; 548 NW2d 199 (1996), where our Supreme Court reiterated that, "[i]n Michigan, it has long been the rule of law that proof of the corpus delicti is required before the prosecution is allowed to introduce the inculpatory statements of an accused."

Again, the evidence presented at the preliminary examination fails to establish by probable cause that Vickie's death can be attributed to some criminal agency. Dr. Dragovic and Dr. Shakkottai, who both have experience with Spinocerebellar Ataxia Type 1 and were certified as expert witnesses in neuropathology and Spinocerebellar Ataxia, respectively, were overwhelmingly clear that Vickie died due to natural causes. Specifically, the expert witnesses in this field opined with reasonable certainty that Vickie died due to bronco pneumonia, a complication of the natural progression of Spinocerebellar Ataxia Type 1.[4] Without some type of evidence of intent of causation, the charges brought against defendants cannot be sustained.

I do not believe it was an abuse of discretion to conclude that the prosecution failed to establish probable cause to bindover defendants on the charges of second-degree vulnerable adult abuse, involuntary murder, and felony murder. I would affirm the magistrate's dismissal of the charges brought against defendants.


/s/ Kathleen Jansen

---

[4] Comparatively, Dr. Sung admitted that he was unfamiliar with Spinocerebellar Ataxia Type 1, and concluded that Vickie's manner of death was indeterminable. The magistrate acted within her discretion to give the testimony of Dr. Dragovic and Dr. Shakkottai more weight as they are experts in the field, and Dr. Sung is not.